IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| LISA MCCLAIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 3:11-CV-377 |
| | ) |
| MADISON NATIONAL LIFE INSURANCE | ) |
| COMPANY and DISABILITY REINSURANCE | ) |
| MANAGEMENT SERVICES, INC., | ) |
| | ) |
| Defendants. | ) |

## <u>OPINION AND ORDER</u>

This matter is before the Court on: (1) Defendant Madison National Life Insurance Company's Motion for Summary Judgment, filed on June 17, 2013 [DE 49]; (2) Defendant Disability Reinsurance Management Services, Inc.'s Motion for Summary Judgment, filed on June 17, 2013 [DE 51]; and (3) Defendants' Motion to Exclude Report and Testimony of Robert DiLisio and Brief in Support Thereof, filed on June 17, 2013 [DE 53]. Upon due consideration, the summary judgment motions are **GRANTED IN PART** and **DENIED IN PART**. Counts II and III of the Amended Complaint are dismissed. The motion to exclude DiLisio's report and testimony is **GRANTED IN PART** and **DENIED IN PART.** DiLisio's testimony regarding industry standards is admissible but his opinions on the issue of whether Defendants acted in bad faith are precluded.

BACKGROUND

Lisa McClain ("McClain") worked as a third grade teacher at Logansport Community School District ("Logansport") for approximately 13 years. In 2006, she suffered a stroke but was able to return to work the following year. She worked until 2010, but then McClain claimed that she was unable to work due to disability. McClain alleges that she had a long term disability benefits policy ("Policy") issued by Madison National Life Insurance Company ("Madison") and administered by Disability Reinsurance Management Services, Inc. ("DRMS"), under which Madison agreed to pay long term disability benefits in the event McClain became disabled. The Policy was issued with an effective date of January 1, 2010. McClain alleges that she became totally disabled on January 22, 2010, but Madison has refused to pay her claim.

McClain has sued Defendants Madison and DRMS asserting that Madison breached their contract (Count I) and the covenant of good faith and fair dealing (Count II). (DE #26). McClain further alleges that both Madison and DRMS breached their fiduciary duties owed to McClain (Count III). Following the close of discovery, the instant motions were filed. They are now fully briefed and ripe for adjudication.

<u>DISCUSSION</u>

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *NUCOR Corp. v. Aceros Y Maquilas de Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes "demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the nonmovant must support its assertion that a fact is genuinely disputed by citing to particular parts of materials in the record. Fed. R. Civ. P. 56(c); *Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989).

"Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect* the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (emphasis in original) (citing *Anderson*, 477 U.S. at 248).

"A party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley Country REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.,* 955 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate.

<u>Facts</u>[1]

<u>McClain's Employment with Logansport School Corporation</u>

From approximately 1996 until 2010, McClain was employed by Logansport School Corporation ("LCS") as a third-grade teacher. (McClain Dep. at 8). Comments from a review of McClain's performance in 2005 indicate she was an effective teacher and a

---

[1]The facts in this case are largely uncontested and the Court has therefore relied heavily on the facts as presented in the Defendants' motions for summary judgment, supplementing and editing where necessary.

leader in her school.

> Mrs. McClain had instructional time well organized and paced to sustain the interest of students. She kept the discussion moving by encouraging students to voice their thoughts and opinions and ask questions. Transitions were smooth and student behavior was monitored.

> Mrs. McClain maintains a very pleasant learning environment for students. Her classroom has a warm and inviting atmosphere. She interacts well with students and specifies behavior expectations, treating students fairly and equitably. When disciplining or correcting negative behavior, she does it privately so as not to embarrass the students and keep their self esteem in tact [sic].

> Mrs. McClain interacts with students and fellow staff members in a positive manner. She takes initiative to develop and promote special programs. She organized and continues to chair the 5-Star Family program at Landis. This has proven to be a successful program in promoting parent and family involvement.

(Lamson Aff. Ex. A at 217-18).

In October of 2006, McClain suffered a cerebrovascular accident ("CVA") or stroke that left her with permanent brain damage. (*Id*. at 171-209). As a result, McClain spent four weeks in rehabilitative therapy. (*Id*. at 219).

In February and March of 2007, McClain received neuropsychological testing from Theresa Strout, HSPP Ph.D. ("Dr. Strout") to assess her cognitive function. (Document Production of Lisa McClain, DE 49-2 at 2-6). Dr. Strout opined that McClain's intellectual ability, executive functions, and attention/memory

functions were all within "normal" - that is, low-to-high average - ranges. (*Id.*). Dr. Strout concluded that "there is no evidence of loss of intellectual functioning." (*Id.*).

By March 13, 2007, Bradley Vossberg, McClain's physician, opined that she could return to work. (Document Production of Lisa McClain, DE 49-2 at 1). Dr. Vossberg wrote in an office note:

> Her IQ is good. High-average verbal memory. Visual memory is average to low-average, this is her biggest deficit. Neuropsych testing showed mild impairment ... She should be able to return to work.

(*Id.*).

McClain returned to work at LCS as a teacher for the 2007 summer school term. (McClain Dep. at 9). McClain testified that she was at this time experiencing the same symptoms, in the same severity, as in 2010 when she first claimed disability. (*Id.* at 22-23).

At the beginning of the fall 2007 term, McClain was assigned to teach third grade. (*Id.* at 37). Three weeks later, she took a medical leave due to pregnancy, but she returned to work in October of 2007. (*Id.*). McClain testified that her principal lacked confidence in her ability to discharge the duties of her job. (*Id.* at 40). She was almost immediately assigned two mentors. (*Id.* at 41). These mentors remained assigned to McClain for most of the remainder of her employment with LCS. (*Id.* at 45).

During the 2008-09 term, McClain received numerous written

criticisms of her job performance. In March, August, and October of 2008 and May and July of 2009, McClain was issued disciplinary memorandums directing her not to leave her classroom unattended or leave the building during the day except for lunch. (LCS Document Production, DE 49-3 at 4-10). The October 2008 memorandum included a five day loss-of-pay suspension and advised that further misconduct by McClain would result in termination. (*Id.* at 8). The May 2009 memorandum documented McClain's continued disobedience and noted a recommendation that McClain's contract be terminated. (*Id.* at 7). The July 2009 memorandum documented still further disobedience and advised McClain for at least a third time that she could be terminated if she continued to leave the building without permission. (*Id.* at 5).

In December of 2008 and March and November of 2009, McClain received poor performance reviews criticizing a number of aspects of her job performance. A performance review dated December 5, 2008, criticized McClain for not sufficiently managing her classroom, for how she handled allowing students to go to the bathroom, for failing to enter certain data into school computers, and for failing to turn in lesson plans. (McClain Dep. Ex. 2-3; Lamson Aff., Ex. A at 220-31). McClain was also criticized for sitting behind her desk reading to herself for long periods of time rather than walking around and interacting with students. (McClain Dep., Ex. 3). McClain was criticized for leaving her classroom

unattended and leaving the building during her prep period without permission. (*Id.*). The December 2008 review concluded that McClain would "need to improve her teaching ability and opportunities for students if she is to remain a teacher here at Landis Elementary." (*Id.*).

The March 2009 review similarly criticized McClain for problems such as her failures to enter student grades into the school software, failures to turn in lesson plans, failures to return graded work to the students, and sitting behind her desk rather than interacting with students or supervising their work. (*Id.* at 55). The March 2009 review further criticized McClain for an incident in which she had been notified that no science grades had been entered for a 9 week period, and she responded by adding two homework grades of 100% for each student so that each and every of her students received a 100% A in science for a 9-week grade. (*Id.*). McClain was also criticized for showing videos during ISTEP week "when prime teaching and reviewing should have been taking place." (*Id.*). The March 2009 review also criticized McClain for unexcused absences, and, significantly, for continuing to leave her classroom unattended and leaving the building without permission during work hours. (*Id.* at 60-62, Ex. 2).

The March 2009 review concluded by again noting that McClain would "need to improve her teaching abilities and opportunities for the students if she is to remain a teacher here at Landis

Elementary." (*Id.* at Ex. 2). McClain was placed on a School Improvement Plan which required her to, among other duties, keep her paperwork up to date, cease leaving her classroom unattended, and cease leaving the building without permission. (*Id.* at Ex. 4). McClain admits that she failed to remedy many of these behaviors even after receiving the School Improvement Plan. (*Id.* at 49, 62). McClain received another negative review in November of 2009 addressing the same general issues raised in the December 2008 and March 2009 reviews. (Lamson Aff., Ex. A at 220-31).

LCS escalated McClain from a "School Improvement Plan" to an "Intensive Assistance Plan" or "IAP", which McClain characterized as a "last chance." (McClain Dep. at 67; Lamson Aff. Ex. A at 231). The IAP required McClain to attend training, to turn in detailed lesson plans weekly, to keep her other paperwork up to date, and to cease leaving the building without permission. (McClain Dep. at 67-70). Despite the specificity of tasks listed in the IAP, McClain claims that she failed to meet some of the requirements because she "didn't understand" what to do and just "didn't get it." (*Id.* at 69).

McClain testified that the poor performance reviews she received in 2008 and 2009 were the result of cognitive limitations she had suffered since the October 2006 CVA. (*Id.* at 20). McClain testified that, as early as 2007, "I had trouble with time management. I had trouble with processing new information. I had

trouble connecting my life with prior knowledge." (*Id.*). She testified that starting shortly after the 2006 CVA, she suffered decreased motivation: "I used to be kind of a go-to person. If you wanted it done, I would get it done, and that's - I don't have the organization and ambition to do it." (*Id.* at 21).

McClain also testified that she began to have hearing loss in 2007, around the time of her return to work. (*Id.* at 28). McClain testified that these hearing issues became worse by the fall of 2009. (*Id.* at 27-29). McClain claims that she was "forced" to sit behind her desk - a practice criticized by LCS - in order to "hear" the students as early as March of 2009. (*Id.* at 55-56). McClain's performance reviews show that she was receiving criticism for sitting behind her desk as early as December of 2008. (*Id.* at Ex. 3). McClain admits that she never attempted to wear hearing aids to improve her hearing. (*Id.* at 29). McClain does not see any provider regularly about her hearing problem. (*Id.* at 31).

One of the mentors assigned to McClain, Tom Anders, had worked with her both before and after her stroke. (Anders Aff. ¶ 4). Prior to her stroke, he describes her as an excellent educator: dynamic, organized, patient, and a leader. (*Id.* at ¶ 5). After her stroke, she was "a totally different person." (*Id.* at ¶ 6). "Her personality had changed; she was not organized; she was not able to multi-tasks [sic]; she was overwhelmed; she was easily flustered; and she couldn't meet deadlines." (*Id.*). Anders met

with McClain once a week to try to assist her. (*Id.* at ¶ 7). According to Anders, "no matter how hard [he] and other members of the faculty tried, [they] were not able to bring Lisa back to being the highly functioning educator that she was before her stroke." (*Id.*). They tried everything they could think of to help McClain between the fall of 2007 and January of 2010, "but it became undeniable that she could not meet the responsibilities of her job." (*Id.* at ¶ 8).

On January 22, 2010, McClain was placed on a paid leave of absence from LCS "due to medical issues which are impacting [her] performance." (McClain Doc. Prod. DE 49-2 at 7). McClain's paid leave of absence lasted until October 1, 2010.[2] (McClain Doc. Prod. DE 49-3 at 1). On June 9, 2010, Craig Blume, teacher's union representative, sent the LCS superintendent a letter requesting that LCS extend "due process timelines [sic]" for any decision on McClain's employment status. (LCS Document Prod. DE 49-3 at 2). The teacher's union proposed that LCS "rescind that letter of notification on the consideration of cancellation of her indefinite contract" if McClain's long-term disability benefit claim was approved, but "reactivate the cancellation letter . . . affording her the opportunity to submit a letter of resignation if she chooses" if her claim was denied. (*Id.*). On October 8, 2010, LCS

---

[2] Defendants state that McClain's paid leave of absence lasted until April 16, 2010, but this discrepancy is not material. (McClain Doc. Prod. DE 49-3 at 4).

sent a letter to the teacher's union by counsel, confirming "phone conversations earlier this morning wherein Logansport Community School Corporation and . . . Lisa McClain have reached an agreement with respect to her current employment status. At this time the parties agree that she will remain on unpaid leave, without benefits, until her long term disability appeal is resolved, either favorably or unfavorably." (*Id.* at 1). It appears that McClain remains on unpaid leave at this time.

<u>McClain's Disability Claim</u>

McClain filed a claim for benefits with Madison on May 13, 2010. (Lamson Aff. Ex. A at 336-38). She indicated that she ceased work on January 22, 2010, but that her claim was related to her stroke in October of 2006. (*Id.*). She indicated that she was still recovering from the stroke and that her symptoms were poor memory and difficulty processing new information. (*Id.*). She also indicated that she could return to work if accommodations were made. (*Id.* at 337). McClain claims that the symptoms that made her unable to work in 2010 were the "same sort of symptoms" she complained of shortly after returning to work in 2007. (McClain Dep. at 22). She indicated that the symptoms were "the same" when she stopped working in January of 2010 as they were when she returned to work in 2007. (*Id.* at 22-23).

The parties dispute whether McClain has consistently

maintained that the condition that caused her to stop working in 2010 are the same as those she experienced since her stroke in 2006. Defendants initially argued that "McClain's claim for benefits contends that she became disabled on January 22, 2010" not that she has been working while disabled since her return in 2007. (DE 57 at 8). But, in reply, Defendants conceded that the claim form is actually "silent on the date she became **unable** to work." (DE 66 at 2-3)(emphasis in original). Defendants suggest that they tried to clarify this uncertainty by seeking additional information from Dr. Dutter, one of McClain's treating physicians. Dr. Dutter indicated that "what changed" in January of 2010 was that McClain became "unable to keep up in the classroom; less support/assistance." (Dutter Dep. Ex. L.). Madison asserts that it took this as a confirmation that while McClain's symptoms may have began in 2006, they did not become impairing until 2010, after the effective date of the Policy. (DE 66 at 3). Madison also notes that McClain's counsel indicated in an appeal letter that "as of January 22, 2010, Ms. McClain was no longer able to work at all." (Lamson Aff. Ex. A at 153). LCS completed a "Long-Term Disability Claim Job Analysis" indicating that McClain became disabled on January 25, 2010. (*Id.* at 166-67). And, the amended complaint itself in this matter indicates that McClain taught at LCS for nearly 14 years "until she became totally disabled on January 22, 2010." (Complaint, DE 26 at ¶ 11).

McClain alleges that she is unable to perform the material duties of a teacher because she is no longer "able to predict where a situation could go" and "can't multitask," as documented in her December 2008 and March 2009 performance reviews. (McClain Dep. at 23-24). Those claimed limitations and her ability to perform as a teacher were generally the same when she ceased work in 2010 as they had been at least as early as December of 2008. (*Id.* at 24, 64). Referring to her reviews, McClain testified, "[p]age after page after page, I'm not getting it [teaching] done. I can't do it. I can't teach. I can't work. I'm disabled." (*Id.* at 73). In short, although McClain has not always clearly annunciated when she believes she became unable to do the material aspects of her job, it is nonetheless undisputed that McClain claims her disabling condition began in 2006. (McClain's Response to Interrogatory No. 2(b) and (e)). According to McClain's interrogatory responses:

> As of October 24, 2006, I have been unable to perform one or more of the material duties and responsibilities of my occupation as an elementary school teacher. Through the assistance of mentors and staff, I was able to maintain my employment despite being unable to perform all the material duties of my job until January 22, 2010.

(*Id.* at No. 20). This is consistent with the opinion of one of McClain's treating physicians, Dr. Dutter, who opined that "disability started when the stroke happened, before she even went back to work." (Dutter Dep. at 21). Dr. Dutter opined that she was not capable of performing all of the material duties of her job

as a teacher at any point after the stroke. (*Id.* at 23-24).
Although McClain's neuropsychological testing looked "pretty
normal," Dr. Dutter speculated that McClain had concentration
issues that might not show up on examination. (*Id.* at 38).

Madison's Policy of Insurance

The Policy under which McClain seeks long-term disability
benefits was issued to LCS with an effective date of January 1,
2010. (Lamson Aff. Ex. A at 13). The Policy's insuring clause
states: "If you become disabled while insured under the Group
Policy, we will pay LTD Benefits according to the terms of your
Employer's coverage under the Group Policy, after we receive
satisfactory Proof of Loss." (*Id.* at 20, § I). According to
Defendants, the Policy's definition of Disability or Disabled can
be found in Amendment 1 and is as follows:

> 1. during the Elimination Period and your Own
> Occupation Period you are, as a result of
> Physical Disease, Injury, Mental Disorder,
> Substance Abuse or Pregnancy, unable to
> perform one or more of the Material Duties of
> your Own Occupation. ...; or
>
> 2. during the Elimination Period and the
> first 24 months you are Disabled with Work
> Earnings, your Work Earnings are less than 99%
> of your Predisability Earnings as a result of
> Physical Disease, Injury, Mental Disorder,
> Substance Abuse or Pregnancy, and you are
> incapable of earning 85% or more of your
> Predisability Earnings....

(*Id.* Ex. A at 45-46).

McClain suggests that a different definition of disability, the one in the original certificate of insurance, is applicable:

> Disability or Disabled means that during the Elimination Period and your Own Occupation Period you are, as a result of Physical Disease, Injury, Mental Disorder, Substance Abuse or Pregnancy, unable to perform one or more of the Material Duties of your Own Occupation, and, due to such inability, your Work Earnings are less than 99% or more of your Predisability Earnings.

(*See* Lamson Aff. Ex. A at 27). The definition McClain relies upon was replaced with Amendment 1, which, according to the amendment itself, became effective on January 1, 2010. (Lamson Aff. Ex. A at 43, 45-46).

The Policy defines "Own Occupation" as "the occupation you routinely perform for the Employer at the time Disability begins." (*Id.* Ex. A at 17). Further, the Policy provides that, "[w]e will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." (*Id.*).

"Material Duties" is defined as "the duties generally required by employers in the national economy of those engaged in a particular occupation that cannot be reasonably modified or omitted...." (*Id.* Ex. A at 20, § II).

Additionally, benefits are not payable until Madison receives proof of loss that it finds satisfactory. (*Id.* Ex. A at 35, § XX.B.3). Madison reserves the right to "investigate a claim at any

time." (*Id*. Ex. A at 35, § XX.C.1).

The Policy requires that, to be eligible for insurance under the plan, you must be an "Eligible Person." (*Id*. Ex. A at 20, § II). To be an "Eligible Person" five requirements must be met: the individual must be an employee, a citizen, "Actively at Work and capable of sustained Active Work", not a part-time, temporary, or seasonal worker, and satisfy your waiting period. (*Id*.). "Active Work" and "Actively at Work" are defined as "performing all the Material Duties of your Own Occupation at your Employer's usual place of business, and satisfying the Minimum Hourly Work Requirement." (*Id*. Ex. A at 20, § II.A.3.a). However, "[i]f you were eligible for insurance and insured under the Prior Plan on the day before the Plan Effective Date, you can become insured on the Plan Effective Date without meeting the Active Work requirement under Section II.A.3." (*Id*. Ex. A at 26, § VI.A).

The Policy also provides, with regard to the effective date of insurance, that "[i]f you are incapable of sustained Active Work due to a Disability on the day before the scheduled effective date of your insurance, such insurance will not become effective until the day after you are capable of sustained Active Work and complete one day of Active Work as an Eligible Person." (*Id*. Ex. A at 20, § III.B.3). The parties disagree regarding whether this provision is applicable to McClain.

Upon receipt of McClain's claim in 2010, one of the very first actions Madison National took was to inquire whether McClain had been insured under the school corporation's prior disability policy. (Lamson Aff., Ex. A at 236). The Claim File shows McClain's effective date of coverage under the Madison's Policy as January 1, 2010. (Lamson Aff., Ex. A at 3).

McClain's claim was considered by Senior Claims Analyst Lisa Caflisch ("Caflisch"). (Caflisch Dep. at 32). Caflisch obtained and considered a wide range of information, including the claim form submitted by McClain and discussed above. She also considered the opinions of Dr. Dutter. Dr. Dutter provided an "Attending Physician's Statement" which lists her symptoms as "history of CVA, aneurysm of middle cerebral artery, S/P VP shunt." (Dutter Dep. Ex. I). Dr. Dutter indicated that McClain's allegedly disabling symptoms first appeared in October of 2006. (*Id.*). Dr. Dutter indicated that McClain's condition had improved since October 2006 but that he "never" expected to see a "fundamental or marked change" in her current condition. (*Id.*). Caflisch also considered a letter from Dr. Dutter dated February 9, 2010, which includes the following:

> First off Lisa is a walking miracle. She was very fortunate to even survive the aneurysm and CVA that she did have. She has made a miraculous recovery. This however does not mean that she is able to function in the classroom at her previous job like she was

> able to before the CVA. Physically her exam
> is very normal. And with memory and recall
> again her exam is pretty normal. This does
> not take into account distractibility
> concentration et cetera. I do feel that she
> has to be considered for long-term disability
> because of her inability to perform like she
> was able to prior to the CVA.

(*Id.*). Caflisch requested further information regarding what changed in McClain's condition around January 22, 2010, and in response Dr. Dutter wrote that McClain was "unable to keep up in classroom; less support/assistance." (*Id.*). At his deposition, Dr. Dutter clarified that he meant that McClain's condition did not change in 2010, but her employer's willingness to accommodate her changed. (*Id.* at 53-54). Caflisch obtained notes from McClain's office visits with Dr. Dutter. (*Id.* at Ex. N). These notes indicated Dr. Dutter performed a "mini-mental state" exam and that McClain scored a perfect 30 out of 30 on the exam. (*Id.*). Dr. Dutter provided Caflisch with a note indicating he advised McClain to cease work on February 9, 2010. (*Id.* at Ex. M). At his deposition, Dr. Dutter was unsure whether he told McClain that she should stop working. (*Id.* at 27).

Caflisch reviewed the entire claim file. (Caflisch Dep. at 32). She contacted McClain to request further information. (*Id.* at 33, Ex. 1). She also contacted LCS and discussed McClain's job performance with Teresa Popejoy ("Popejoy"). (Caflisch Dep. at 36-38, Ex. 1). She investigated whether McClain was covered by LCS's prior disability policy. (Lamson Aff. Ex. A at 235).

Caflisch brought up that McClain had been back to work for 3 years since the time of her CVA and asked Popejoy what changed. (*Id.*). Caflisch's notes regarding that conversation, which took place on June 3, 2010, indicated the following:

> I asked if there was anything special we should know about the EE. She said the EE doesn't process things very well. For example, the EE didn't understand that she needed to fill out and return the LTD claim form. They had to ask the EE's mother for assistance.
>
> I asked how long the EE worked after her stroke. She said the EE returned to work PT in 7-07 and FT in 08-07. I noted that she worked for about 3 years and asked what changed during that time that rendered her unable to perform her job. She said the EE did strange things at times. For example, she would disappear during the day, in some cases leaving the classroom unattended. She would walk to a nearby convenience store for a soda. She said the EE doesn't understand that she has responsibilities. I asked if they tried to accommodate her limitations. She said they tried everything, but nothing worked.
>
> On another note, she mentioned that the EE has been separated from her husband for a year. She wasn't sure if their divorce was finalized yet.

(*Id.* at 235).

Caflisch understood McClain to be claiming that she became disabled – meaning she went from being able to perform her job to being unable to do so – on or about January 22, 2010. (Caflisch Aff. at ¶ 6). When Caflisch was told that McClain "did strange things at times," she understood that to mean that McClain had

changed around January of 2010 by beginning to do strange things. (*Id.* at ¶¶ 9-10). In addition, Caflisch had asked Dr. Dutter what changed with McClain's condition that made her unable to work after January 22, 2010. (*Id.* at ¶ 11). Dr. Dutter indicated that McClain was "unable to keep up in classroom; less support/assistance." (*Id.* at ¶ 7). Caflisch indicated that neither McClain, her attending physician, or her employer told her that McClain was claiming to have been unable to work since 2006. (*Id.* at ¶ 12). Furthermore, if they had, she would have denied the claim pursuant to Section III.B.3 of the Policy. (*Id.* at ¶ 13; Lamson Aff. Ex. A at 21 ("If you are incapable of sustained Active Work due to a disability on the day before the scheduled effective date of your insurance, such insurance will not become effective until the day after you are capable of sustained Active Work and complete one day of Active Work as an Eligible Person.")).

Caflisch determined that additional testing was necessary and requested an IME. (Caflisch Dep. at 33, Lamson Aff. Ex. A at 233). Madison retained third-party vender Independent Medical Services ("IMS") who contracted with Dr. Shepard, a neuropsychologist, to perform the independent examination. (Lamson Aff. Ex. A at 261). Dr. Shepard conducted a clinical interview with McClain and reviewed her medical records, claim file, and a written description of her job duties. (Caflisch Dep. Ex. 6 at 251). Dr. Shepard performed a new comprehensive battery of neuropsychological tests

on McClain. (*Id.* at 252). Dr. Shepard found that McClain's reading, basic arithmetic, spelling, language skills and fund of information were average. (*Id.* at 255-56). Her current intellectual ability, verbal abilities and non-verbal abilities were all high average. (*Id.*). Her attention, working memory, and processing speed, new learning, short-term recall, executive functions, visuospatial and visuocosntructional ability were all average to high average. (*Id.*). Her figure oscillation/grip strength was low average. (*Id.*). Her speeded fine motor dexterity was mildly impaired. (*Id.*). Dr. Shepard concluded that the "pattern of findings was consistent with a normal cognitive examination" and that "[b]ased on the present neuropsycholgoical examination, there are no neurocognitive impairments and, in essence, no neuropsychological reason that Ms. McClain could not successfully function as a teacher." (*Id.* at 257-58).

Caflisch considered McClain's claim on its "unique and individual merits." (Caflisch Dep. at 64). She considered "everything contained in the claim file" and did not discount or disregard McClain's statements, the statements of her employer, or the information provided by Dr. Dutter. (*Id.* at 67-68). Caflisch took into account that the Shepard Report was "more recent" than the 2007 data relied upon by Dr. Dutter. (*Id.* at 42-43). In reviewing the Shepard report, Caflisch determined that it showed objectively "normal cognitive examination" and that "there were no

neurocognitive impairments present and, therefore, no neuopsychological reason why [McClain] could not perform her job as a teacher." (*Id.* at 54). Caflisch concluded that "[t]he medical evidence did not support [McClain's] inability to perform her job." (*Id.* at 54).

In a letter dated August 26, 2010, Caflisch explained her reasons for denying McClain's claim as follows:

> The information received indicates that you suffered an aneurysm in late 2006, recovered sufficiently to return to work in mid 2007, and continued to work until January 22, 2010. The information received from Dr. Dutter indicates you are suffering from residual effects of the aneurysm. However, no new cognitive testing was done to confirm the doctor's assessment.
>
> In order to help us determine your eligibility for benefits, we contracted with an independent provider through Independent Medical Services for a neuopsychological examination...Dr. Shepard indicates there are no neuorocognitive impairments present, and therefore, no neuopsychological reason why you cannot perform your job duties as a Teacher.

(Lamsom Aff., Ex. A at 248-49). The decision to deny the claim was not based on a lack of coverage. (DE 63 at 16). McClain formally appealed Madison's denial of her claim on February 22, 2011. (Lamsom Aff. Ex. A at 153-62). On February 28, 2011, Madison acknowledged McClain's appeal and notified McClain that it was forwarding her appeal to Madison's third party claims appeals administrator, DRMS. (Lamson Aff. Ex. A at 151-52).

McClain admits she is unaware of evidence that Madison

subjectively believes she is disabled but refused to pay anyway, that Madison did not try to make a factually based decision on her claim, that Madison never deceived her or made an untrue statement, or that Madison failed to consider evidence that it should have considered. (McClain Dep. at 74, 77-78).

DRMS's Administration of McClain's Appeal

When McClain appealed, Madison sent the appeal to DRMS, who served only as an appeals administrator for the Policy. (Lamson Aff. at ¶ 3). In connection with the appeal, McClain's counsel submitted additional medical records related to her CVA, an appeal letter, an additional physician's statement from Dr. Dutter, an opinion statement from neuropsychologist Dr. Lance Trexler, and performance reviews from both before and after her CVA. (Lamson Aff., Ex. A at 153-70; 195-210; 215-19; 220-30). The appeal letter for the first time contended that McClain was disabled due to "hearing loss" and also included records from an audiologist McClain had seen. (*Id.*, Ex. A at 158; 211-13).

The appeal letter drafted by McClain's counsel indicated that "despite her return to work, Ms. McClain was unable to perform the main duties of her occupation as a teacher and as of January 22, 2010, Ms. McClain was no longer able to work at all." (*Id.*, Ex. A at 154). At the same time, the appeal letter argued that McClain's performance reviews, including the November 2009 review "show that

McClain's inability to perform her job is the cause of the effects of the brain aneurysm she suffered in October 2006." (*Id.*, Ex. A at 160).

Dr. Dutter's new physician statement on appeal opined that "physically her exam is normal. Memory and recall exam are pretty normal." (*Id.*, Ex. A at 196). As to hearing loss, Dr. Dutter stated that "Lisa . . . has a hard time hearing since her CVA." (*Id.*).

With her appeal, McClain included a neuropsychology evaluation from Dr. Lance Trexler, a neuropsychologist with over thirty years of experience. (Lamson Aff., Ex. A at 203-09). Dr. Trexler provided his medical opinion that McClain has cognitive impairments that correspond to the brain damage she sustained as a result of her 2006 stroke and that such impairments preclude her from being able to perform the material duties of a third grade teacher. (*Id.*).

The neuropsychological opinion report provided by Dr. Trexler ("Trexler Report") opined that "McClain's level of cognitive function is remarkably good given her stroke." (First Dep. of Dr. Lance Trexler, Ex. F at 208). At his deposition, Dr. Trexler admitted that the tests he conducted showed test scores substantially similar to those found by Dr. Shepard, although the two doctors reached different conclusions regarding McClain's level of impairment. (*Id.* at 53-54). He performed a different, and in

his opinion more appropriate, battery of tests on McClain than those performed by Dr. Shepard. (*Id.* at 49-65; Trexler Report, Ex. 9).

Despite this, Dr. Trexler concluded that "McClain evidences clear impairment of neuropsychological function, in the context of excellent cognitive reserve, and I would not be surprised that in more functionally complex environments, especially like a classroom, Mrs. McClain's impairments would be much more manifest . . . " (First Dep. of Dr. Lance Trexler, Ex. F at 208). Dr. Trexler did not during the appeal provide DRMS with any of the scores or other raw data related to any of the tests that he performed on McClain. Dr. Trexler, however, could not have provided those scores to anyone other than a qualified neuropsychologist.[3] (Trexler Dep. at 13-14).

Madison sent the claim file and appeal packet to DRMS for review. (Hanson Dep. at 14). The appeal was assigned to Senior Appeals analyst Jennifer Pardi-McCarthy ("Pardi-McCarthy"), and, after Pardi-McCarthy left DRMS for new employment, re-assigned to Senior Appeals analyst Merle Hanson. ("Hanson") (*Id.* at 15). Before leaving DRMS, Pardi-McCarthy determined that further investigation was warranted based on the Trexler Report and requested a records

---

[3] Both the American Psychological Association and the National Academy of Neuropsychologists state that raw data should not be released to anyone other than a qualified neuropsychologist. (Trexler Dep. at 13). The Defendants should have been aware of this requirement because when McClain requested Dr. Shepard's raw test data, they advised McClain of this requirement. (Lamson Aff., Ex. A at 237-40).

review from a neutral third-party vendor Behavioral Medical Interventions ("BMI"), who contracted neuropsychologist Dr. Mark Brooks to review the available records. (*Id.* at 18-19). Sending an appeal file out for an additional independent review is standard practice for DRMS when considering a claim denied based on a conclusion that the claimant had not shown sufficient proof of disability. (*Id.* at 19). DRMS intentionally chose a "totally different" vendor to perform the records review than had been hired by Madison to perform the IME. (*Id.* at 20).

Dr. Brooks reviewed all relevant available medical records, including specifically the 2007 neuropscyhological testing done by Teresa Strout, the Shepard Report and supporting test scores and data, and the Trexler Report. (Lamson Aff., Ex. A at 129-30).[4] Dr. Brooks issued a report of his findings after review of these records ("Brooks Report") (*Id.*, Ex. A at 129-34). Dr. Brooks acknowledged that both Dr. Dutter and Dr. Trexler characterized McClain as being unable to perform the duties of a teacher. (*Id.*, Ex. A at 130, 132).

Dr. Brooks noted that the neuropsychological testing conducted in 2007 (by Dr. Strout) and 2010 (by Dr. Shepard) showed no evidence suggesting any impairment that would prevent McClain from performing the duties of a teacher. (*Id.*, Ex. A at 131-32). Dr.

---

[4] Dr. Brooks never physically examined McClain, but rather only reviewed her medical records. (Lamson Aff., Ex. A at 129-34).

Brooks noted that the Trexler Report opined that McClain was impaired, but failed to back that opinion up with any supporting data or test scores. (*Id.*). Dr. Brooks observed that the Trexler Report "opines that Ms. McClain presents with sufficient cognitive deficits . . . but includes no neuropsychological data, and the report is somewhat difficult to follow with regard to conclusions based on mixed results. The absence of supportive assessment data [that is, actual test scores] limits the conclusions that can be reached from this report." (*Id.*, Ex. A at 133). Dr. Brooks did not request the raw data. (Hanson Dep. at 50-52). Dr. Brooks indicated that Defendants did not request that he ask for the raw data. (Brooks Dep. at 30-32). Additionally, he felt he had enough information to write his report. (Brooks Dep. at 32). DRMS, however, points out that it did not engage Dr. Brooks - DRMS hired BMI to perform a file review, and BMI contracted with Dr. Brooks. (Brooks Dep. at 16-18). Because the exam was to be independent, DRMS had no direct contact with Dr. Brooks. (Brooks Dep. at 36). Dr. Brooks concluded that the medical records taken as a whole did not support a finding that McClain suffered a disabling cognitive dysfunction. (Lamson Aff., Ex. A at 133).

Dr. Brooks noted that McClain's claim of hearing loss was outside of the scope of his expertise. (Hanson Dep. at 22-23). DRMS accordingly requested that BMI retain a specialist to review McClain's hearing loss claim. (*Id.* at 23). BMI referred the

hearing loss issues to Dr. Robert Carpenter. (Lamson Aff., Ex. A at 121-24). Dr. Carpenter reviewed the audiological records provided by McClain on appeal, and stated that the records show "a moderate to severe hearing loss in the right ear which is improved with amplification or hearing aids to 88% discrimination." (*Id.*, Ex. A at 123) (emphasis added). Dr. Carpenter concluded that "if the claimant were aided with hearing aids, her hearing should be able to be returned close to normal range . . . . With amplification, there would be no restrictions or limitations according to the presented audiogram." (*Id.*, Ex. A at 124) (emphasis added). Even though the Carpenter Report concludes that McClain would have no limitations if she used hearing aids, McClain testified that she had not tried hearing aids because they are expensive and a doctor told her they would not help her. (McClain Dep. at 29).

After review of Dr. Carpenter's original report, DRMS had further questions concerning whether McClain had been wearing hearing aids at the time of the tests and whether Dr. Carpenter could correlate the results of his testing back to January of 2010. (Hanson Dep. at 25; Lamson Aff., Ex A at 121). Dr. Carpenter generated a supplemental report addressing these questions. (Lamson Aff., Ex. A at 119-20). Dr. Carpenter noted that "standard practice is such that hearing aids are not worn during an audiogram. Therefore, I can state with a reasonable degree of medical certainty that the claimant would not have been wearing any hearing

aid device during the time of the audiogram." (*Id.*, Ex. A at 119-20). Dr. Carpenter also concluded that "it is not possible to objectively correlate the hearing loss back to the date of 1/23/10, or back to the date of aneurysm in 2006." (*Id.*, Ex. A at 119).

Hanson reviewed the entire Madison claim file, the appeal packet and new records, the Shepard Report, the Trexler Report, the Brooks Report, and the Carpenter Report and supplement. (Hanson Dep. at 16–17). Hanson determined that McClain's claim had been properly denied by Madison and that "there was no change in Ms. McClain's condition when she stopped working on January 23, 2010." (*Id.* at 38).

On May 25, 2011,[5] Hanson sent a letter to McClain denying her appeal. (Hanson Dep. at Ex. 3). The denial letter summarized the course of McClain's claim proceedings, including the evidence McClain had provided in support of her claim. (*Id.*). The letter also cited and summarized the Brooks Report and the Carpenter Report and their evaluations of the available medical records to date. (*Id.*). The letter concluded: "The medical records provided do not support a change in Ms. McClain's condition at the time she ceased working or her inability from performing one or more of the material duties of her regular occupation . . . ." (*Id.* at 104). The DRMS denial letter did not cite lack of coverage as a basis for

---

[5]The letter is dated May 25, 2010, but the parties agree this is a typographical error.

denying the claim. (Lamson Aff., Ex. A at 102-05).

McClain admits that she has no evidence that DRMS was not trying to make a factually based decision regarding her appeal. (McClain Dep. at 76).

## DeLisio's Testimony

Robert DiLisio ("DiLisio"), an expert in claims processing retained by McClain, testified as follows in his deposition:

> Q: What evidence of conscious wrongdoing is there on Madison's part?
> A: Madison knew that --let me take a step back. This is not a case where the company failed to investigate something that it didn't know about.
> . . .
> This case involves going out and getting information that Madison National was aware of. It made a conscious decision not to go out and get that information. So specifically, when Madison National learned from the employer in its telephone call with the employer that there had been performance issues, when it learned that the employer had tried to make accommodations with the insured because of those performance issues, and then despite that knowledge it chose not to get that information, and it proceeded to evaluate the case strictly from a standpoint of what changes have occurred in her medical condition at the time she became disabled, that, in my opinion, is so far below of what I would call the standard of care or what I would consider reasonable conduct for an insurer, that I believe it's a conscious wrongdoing.

(DiLisio Dep. at 67-69, Ex. 4). When asked about further evidence that Madison engaged in conscious wrongdoing, DiLisio responded as follows:

A: . . . Well, the conscious wrongdoing also in the original claim decision, I think would include the consistent reference specifically in the medical referral there is reference to the fact that Ms. McClain returned to work in 2007 and continued to work until 2010. I think that is very misleading, because it gives absolutely no indication to the reader of the critical importance and the existence of information that supported the claim, namely that yes, she returned to work but she did not successfully return to work. . . .

Q: . . . Is there anything else with Madison?

A: . . . I didn't see any requests for medical records from the physician she was treating with prior to Dr. Dutter, any emergency room or surgical records, any rehab records. I didn't see any requests for performance evaluations. I didn't see any efforts to obtain information from the people who had been assisting her during her employment or the people potentially with her employer or the union who recommended that she pursue a disability claim because she was no longer able to do her job. . . ..

(DiLisio Dep. at 72-74, Ex. 4).

DiLisio also opined that DRMS engaged in conscious wrongdoing:

A: In overseeing an unfair and biased appeal.

Q: Let's start with biased. How was it biased?

A: It was biased because it gave an unfair advantage to the information that it gathered in support of denial. It seemed to go by different, but then seemed to apply a different set of rules with respect to the information that was submitted in support of the claim.
And let me take a step back.
The two, unfair and biased, are certainly overlapped there. They are very closely intertwined, particularly on the issue of the lack of raw data accompanying Dr. Trexler's

report. Dr. Brooks' reference to the fact that
there was a lack of raw data and the failure
of DRMS to go out and obtain that data.

(DiLisio Dep. at 77-78).

DiLisio further testified:

> Q: If Madison had performed this investigation
> you think they should have performed, and if
> they had reached a conclusion that you think
> they possibly could have reached that Ms.
> McClain was working disabled from 2007
> forward, in your opinion would that have
> changed their decision on the claim?

> .... A: Yes, I think in my opinion there is a
> classic case, maybe one
> of the best cases I have
> seen of a person working
> disabled as I understand
> that theory, and as a
> result the claim would be
> payable.

(DiLisio Dep. at 85-86).

DeLisio, however, was working under a false assumption that
the Policy became effective prior to McClain's CVA. "My
recollection is it was several years prior to the '06 event that
the carrier was changed and she was continued under coverage on the
group policy." (DiLisio Dep. at 87). DiLisio conceded that, if
this were wrong then "arguably [McClain] doesn't have a compensable
claim under the policy." (DiLisio Dep. At 89). Before this
concession was made, the following exchange occurred:

> Q: If it were the case that this policy had
> come into effect well after the cardiovascular
> accident, would that change your opinion?
> A: No. It would change my analysis a little
> bit, but in my opinion it wouldn't change the

ultimate result.    In other words, I would probably analyze it along these lines.

You still notice provisions in the policy.    You still have requirements that claims be filed in certain timely fashion when a person knows they have a compensable claim. I think you could reach, the analysis would be that even though this policy went into effect after the date or after '06, she is not looking for benefits back to '06.    She continued to work.

She is looking for benefits after the point where she could no longer work and after the point that this policy had become effective.    So my analysis is it would be compensable.

(DiLisio Dep. at 87-88).


## Timing of Madison's Argument that the Policy did not cover McClain

According to McClain, Madison first argued that she was not covered by the Policy in the instant summary judgment motion. Madison, however, raised the issue in its answer in October of 2011. (DE 22 at ¶ 14 ("Plaintiff's claimed injury or disability occurred prior to effective date of the Policy.")).    Madison also argues that its questioning of DiLisio at his deposition on October 29, 2012, showed that they had questions about eligibility.[6]    And, on November 19, 2012, after the deposition of Dr. Trexler, Madison's counsel represents that he had a frank conversation with McClain's counsel about the coverage issue created by McClain's

---

[6] "My recollection is it was several years prior to the '06 event that the carrier was changed and she was continued under coverage on the group policy" and that if this were wrong then "arguably [McClain] doesn't have a compensable claim under the policy."    (DiLisio Dep. at 87, 89).

contention that she has been continuously unable to perform her job since 2006. (DE 66 at 8-9).

McClaim claims that, upon receipt of her claim, one of the very first actions Madison took was to confirm that she was insured under the school's prior disability policy. (Lamson Aff., Ex. A at 236). Diary notes in the claim file indicate that Madison checked for pre-existing group coverage on May 25, 2010. (*Id.*). Notes from June 3, 2010, indicate that someone from Madison asked Teresa Popejoy "if the EE was covered under their prior policy w/ Lincoln Nat'l Life, and if so, when coverage became effective. She said the EE was covered under the prior policy from her date of hire." (*Id.*). The claim file indicates that McClain's effective date of coverage was January 1, 2010. (Lamson Aff. Ex. A at 3).


ARGUMENT

McClain is not covered by the Policy.

Madison argues that, because McClain's allegedly disabling condition existed continuously approximately three years prior to the effective date of coverage of the Policy, they have no obligation to pay benefits both because she did not "become disabled" while insured and because the Policy never became effective for McClain.

The Policy did not become effective until January 1, 2010, three years after McClain's CVA and three years after she returned

to work in 2007. Madison construed McClain's claim as asserting that she was able to perform her duties when she returned in 2007 but became unable to perform her duties on or around January 22, 2010. If that were the allegation, then McClain would have been covered by the plan. But it is now clear that McClain claims that her condition was essentially unchanged from the fall of 2007 until she stopped working in 2010; what changed was not McClain's medical condition but Logansport's willingness to accommodate her limitations.

Insurance contracts are considered "using the same rules of interpretation applied to other contracts." *Auto-Owners Inc. Co. v. Benko,* 964 N.E.2d 886, 890 (Ind. Ct. App. 2012). Where the language is clear and unambiguous, courts apply the plain and ordinary meaning of the contract's provisions. *Id.* "[T]he proper interpretation of an insurance policy, even if it is ambiguous, is generally a question of law appropriate for summary judgment." *Progressive Ins. Co., Inc. v. Bullock*, 841 N.E. 2d 238, 240 (Ind. Ct. App. 2006). *See also Royer v. USAA Casualty Insurance Company*, 781 F.Supp.2d 767, 770 (N.D. Ind. 2011)("Interpretation of a written contract, including a contract of insurance, typically presents a question of law suitable for resolution on motions for summary judgment.").

### McClain did not "Become Disabled" while insured under the Policy.

The Policy's insuring clause states: "If you become disabled while insured under the Group Policy, we will pay LTD Benefits according to the terms of your Employer's coverage under the Group Policy, after we receive satisfactory Proof of Loss." (*Id.* at 20, § I). The Policy, as amended at the time McClain stopped working and when she filed her claim, defines Disability or Disabled as follows:

> 1. during the Elimination Period and your Own Occupation Period you are, as a result of Physical Disease, Injury, Mental Disorder, Substance Abuse or Pregnancy, unable to perform one or more of the Material Duties of your Own Occupation. ...; or
>
> 2. during the Elimination Period and the first 24 months you are Disabled with Work Earnings, your Work Earnings are less than 99% of your Predisability Earnings as a result of Physical Disease, Injury, Mental Disorder, Substance Abuse or Pregnancy, and you are incapable of earning 85% or more of your Predisability Earnings....

(*Id.* Ex. A at 45-46).

McClain's only response to Madison's argument that she did not "become disabled" while insured is to rely on a definition of disability found in the original certificate of insurance but that is no longer applicable because it was changed through a Policy amendment. Under that definition, McClain would not have been considered disabled until her earnings were less than 99% of her pre-disability earnings – after the Policy became effective. Unfortunately for McClain, the definition of disability she relies

upon was not in effect at the relevant time: the definition was replaced with the definition Defendants rely upon through an amendment that became effective on January 1, 2010. (Lamson Aff. Ex. A at 27, 43, 45-46).

Because McClain has asserted without any qualification that she was unable to perform the material duties of her occupation beginning in 2006, no reasonable jury could find that she "became disabled" after the Policy's effective date. Accordingly, unless waiver or estoppel applies, McClain's breach of contract claim must fail.

### The Court need not decide whether the Policy "became effective" as to McClain.

The Policy requires that, to be eligible for insurance under the plan, you must be an "Eligible Person." (*Id*. Ex. A at 20, § II). To be an "Eligible Person" five requirements must be met, including a requirement that the employee be "Actively at Work and capable of sustained Active Work." (*Id.*). "Active Work" and "Actively at Work" are defined as "performing all the Material Duties of your Own Occupation at your Employer's usual place of business, and satisfying the Minimum Hourly Work Requirement." (*Id*. Ex. A at 20, § II.A.3.a). However, the plan also provides that, "[i]f you were eligible for insurance and insured under the Prior Plan on the day before the Plan Effective Date, you can become insured on the Plan Effective Date without meeting the Active Work requirement under Section II.A.3." (*Id*. Ex. A at 26,

§ VI.A). Thus, the active work requirements of Section II of the contract pose no obstacle to McClain.

Section III, however, provides, with regard to the effective date of insurance, that "[i]f you are incapable of sustained Active Work due to a Disability on the day before the scheduled effective date of your insurance, such insurance will not become effective until the day after you are capable of sustained Active Work and complete one day of Active Work as an Eligible Person." (*Id*. Ex. A at 20, § III.B.3). The parties disagree regarding whether this provision is applicable to McClain. Madison claims this requirement must be met separately from the requirement in section II. McClain asserts that Section VI waives the "Active Work" requirement as to the effective date for all employees who were covered by the school's prior disability policy. McClain, who seems to completely ignore the language in Section VI that explicitly states the active work requirement is waived "under Section II.A.3," believes the language "could not be more plain or clear." (DE 63 at 24). McClain is mistaken – it is certainly less than clear. Although it seems that the provision waiving the active work requirement would be rendered meaningless if the requirement was not also waived with regards to Section III, McClain has not made that argument and this Court will not develop arguments for the parties. *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999)("It is not the responsibility of this Court to make

arguments for the parties.").

McClain further claims that there is no contractual ambiguity on this point, but if the Court finds ambiguity, it should be construed in her favor and the Court should reopen discovery to allow McClain to investigate the bargaining history and insurance custom with respect to the clauses at issue. McClain has not demonstrated contractual ambiguity that warrants reopening discovery and, in light of this Court's finding that McClain did not "become disabled" while insured, further discovery would be unwarranted even if McClain had demonstrated ambiguity. Because this Court has already found that McClain did not "become disabled" while insured, it need not decide whether McClain needed to meet the active work requirement of Section III for the plan to become effective as to her.

<u>A question of fact exists regarding implied waiver or estoppel</u>.

McClain argues that, even if she were not covered by the Policy as a matter of law, the Defendants have waived their right to avoid the contract, or alternatively, their conduct throughout litigation should estop them from denying coverage based on eligibility. As the Indiana Supreme Court noted in *Tate v. Secure Ins.*,

> Technically, there is a distinction between "waiver" and "estoppel." A waiver is an intentional relinquishment of a known right and is a voluntary act, while the elements of estoppel are the misleading of a party

-40-

> entitled to rely on the acts or statements in question and a consequent change of position to his detriment. But in the law of insurance, the distinction between "estoppel" and "implied waiver" is not easy to preserve, and, quite commonly, in insurance cases, the courts have found it unnecessary or inadvisable to make a distinction between them and have used the terms interchangeable.

587 N.E.2d 665, 671 (Ind. 1992); *see also Welty Bldg. Co., Ltd. v. Indy Fedreau Co., LLC,* 985 N.E.2d 792, 798 (Ind. Ct. App. 2013). For there to be a waiver, an insurer must have "knowledge of facts which would have permitted it to deny coverage." *Illinois Founders Ins. Co. v. Horace Mann Ins. Co.*, 738 N.E.2d 705, 707 (Ind. Ct. App. 2000). Waiver also requires a "distinct act of affirmance." *See American Family Mut. Ins. Co. v. Kivela*, 408 N.E.2d 805, 811 (Ind. Ct. App. 1980).

McClain asserts that Madison "affirmed the contract at every turn for over three years with full knowledge of the facts that they now claim entitle them to avoidance." (DE 63 at 26). Unfortunately for McClain, the record suggests otherwise. Madison contested coverage at least as early as October of 2011, when Madison filed their answer to the amended complaint. Madison listed several affirmative defenses in its answer, including that "Plaintiff's claimed injury or disability occurred prior to effective date of the policy." (DE 22 at 12). But, ultimately, it is not material whether McClain first learned of Madison's defenses in October of 2011 or May of 2013.

Madison has produced evidence that indicates they understood (or perhaps misunderstood) McClain to be claiming she became disabled on or about January 22, 2010. McClain, however, has produced some evidence that at least suggests this belief was unreasonable. McClain's initial claim form revealed that her claim was at least related to her October 2006 CVA. That form was silent as to the date McClain became unable to perform the material duties of her job. Madison confirmed that McClain had been insured under the prior disability plan shortly after the claim was made, and the claim file reflects an effective date of coverage of January 1, 2010. Dr. Dutter commented, in February of 2010, that McClain should be considered for disability "because of her inability to perform like she was able to prior to the CVA." (Dutter Dep. Ex. I). And, in an early conversation with someone from McClain's school, a Madison representative asked what had changed in the three years since McClain returned to work. The response was that McClain had behaved strangely, and that they had tried to accommodate her "but nothing worked." (Lamson Aff. Ex. A at 235). At least arguably, the response suggests that the problems were not new at all, but ongoing. And, a comparison of McClain's pre-CVA and post-CVA performance reviews shows a consistent pattern of poor performance since the outset of McClain's return to work in 2007. Despite this evidence, Madison did not deny McClain's claim based on a lack of coverage, or even a possible lack of coverage if she

were claiming disability back to 2006. They denied her claim because they did not believe she provided sufficient proof of disability. The denial of McClain's appeal also did not reference any possibility that she may not be eligible for benefits if she was alleging disability beginning prior to January 1, 2010. This evidence, however, does not demonstrate that Madison had the knowledge necessary for it to intentionally relinquishment a known right. Accordingly, McClain's waiver argument fails.

McClain's estoppel or implied waiver argument, however, may proceed to trial. The Indiana Supreme Court, in 2011, stated the following regarding estoppel:

> In describing the doctrine of estoppel, this Court has explained, '[a]lthough variously defined, it is a concept by which one's own acts or conduct prevents the claiming of a right to the detriment of another party who was entitled to and did rely on the conduct.' *Brown v. Branch*, 758 N.E.2d 48, 51-52 (Ind. 2001). Further, 'one who by deed or conduct has induced another to act in a particular manner will not be permitted to adopt an inconsistent position, attitude, or course of conduct that causes injury to such other.' *Id*. at 52.

*Ashby v. Bar Plan Mutual Ins. Co.*, 949 N.E.2d 307, 309-14 (Ind. 2011). In *Ashby*, an attorney abandoned his clients. The clients made claims directly with the attorney's malpractice insurance provider. The policy provided that the attorney had to provide written notice of the claim to the insurance company, but the attorney was not accessible to his clients and did not provide the

-43-

required notice. Nonetheless, upon receipt of the claims, the insurance company's communication with the claimants implied that coverage existed by assigning a claim number, seeking further information, and inviting settlement negotiations. The Court noted that, "[c]onspicuously absent was any caution about possible non-coverage due to the absence of written notice from [the attorney]." *Id.* at 313. On these facts, the Indiana Supreme Court found that there was a genuine issue of fact regarding whether the claimants and their counsel were misled to believe that the insurance company provided coverage for their claims against the attorney. *Id.*

In this case, a reasonable jury could conclude on the basis of the evidence outlined above, that McClain incurred unnecessary expenses when she reasonably relied on Madison's actions suggesting that coverage was not an issue. The extent of these damages is questionable: at least as of October 2011 when Madison's answer clearly stated an affirmative defense based on lack of coverage, McClain's reliance on Madison's prior acts assuming coverage were likely unwarranted.

McClain requests an opportunity to engage in additional discovery to substantiate her claims of detrimental reliance; more specifically, to develop a record of what actions she might have taken if she had known Madison did not believe she were covered. In light of Madison's affirmative defense raising the issue in its answer, there appears to be no reason this issue could not have

-44-

been explored during the discovery period - it is not a new issue as McClain suggests. Acordingly, discovery will not be reopened on this issue.

## McClain has provided sufficient proof of disability to overcome summary judgment.

Madison claims McClain has not provided any objective evidence of her inability to perform the material duties of a teacher - just subjective complaints. Under the plan, "[s]ubjective complaints alone will not be considered conclusive evidence of a Disability." (Lamson Aff. Ex. A at 34, § XIX.A.c). Madison is mistaken in this regard. There is objective evidence of McClain's disability, namely, Dr. Trexler's report. (Lamson Aff., Ex. A at 203-09). Dr. Trexler, a neuopsychologist with over thirty years of experience opined that it is his professional opinion, based on a battery of tests, that McClain is unable to perform the material duties of an elementary school teacher due to cognitive deficiencies that correspond to permanent brain damage. (Trexler Report, DE 49-12).

Madison retorts by noting that even Trexler found that McClain was within normal, average limits of cognitive ability. Trexler's report does state that:

> Mrs. McClain's level of cognitive function is remarkably good given her stroke. She presents with some excellent cognitive abilities reflective of an above average pre-injury cognitive reserve.

(*Id.* at 8). But, Dr. Trexler also noted that it is agreed that

McClain suffered brain damage and CT imaging shows "right frontal chronic encephalomalacin." (*Id.*). He found that she suffers "neuropsychological impairments of fine motor dexterity and coordination bilaterally," "impaired sensory perception on the left hand," moderately impaired psychomotor problem-solving and visual memory, impairments of vigilance, attention and concentration, and "disorganized verbal output consistent with right frontal impairment." (*Id.*). Despite her "excellent cognitive reserve," Dr. Trexler opined based on his experience that he "would not be surprised that in more functionally complex environments, especially like a classroom, Mrs. McClain's impairments would be much more manifest[.]" (First Dep. of Dr. Lance Trexler, Ex. F at 208).

In short, while Dr. Trexler found McClain's cognitive ability to be normal, he also found that McClain suffered a variety of impairments, and those findings were not based on subjective complaints alone. This Court cannot weigh the evidence at the summary judgment stage, and because Dr. Trexler's report offers some evidence of disability, summary judgment is inappropriate on this issue. McClain points to other evidence of disability, but because Dr. Trexler's report creates a genuine issue of fact on this issue, the Court elects not to consider the other evidence that McClain points to in her response.

<u>DiLisio's testimony is admissible in part</u>.

Defendants seek to exclude both the report and testimony of DiLisio claiming he is not qualified, his opinions are not reliable, and his opinions would not be helpful to the jury. Rule 702 of the Federal Rules of Civil Procedure governs the admissibility of expert testimony in federal courts. The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2011).

There is a two-step inquiry to undertake for evaluating the admissibility of expert testimony under Rule 702. *Ancho v. Pentek Corp.*, 157 F.3d 512, 515 (7th Cir. 1998). "First, the court must consider whether the testimony has been subjected to the scientific method; it must rule out subjective belief or unsupported speculation." *Id.* At step one, *Daubert's* familiar nonexhaustive list of four factors is helpful in gauging the reliability and validity of expert testimony:

> 1) whether the theory is scientific knowledge
> that will assist the trier of fact and can be
> tested; 2) whether the theory has been
> subjected to peer review or publication; 3)
> the known or potential rate of error and the
> existence of standards controlling the
> technique's operation; and 4) the extent to
> which the methodology or technique employed by
> the expert is generally accepted in the
> scientific community.

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993); *see also Goodwin v. MTD Products Inc.*, 232 F.3d 600 (7th Cir. 2000).

At step two, the court needs to determine "whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue." *Ancho*, 157 F.3d at 515 (citations omitted). At step two, "an expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *Id.* at 518. "Because an expert's qualifications bear upon whether he can offer special knowledge to the jury, the *Daubert* framework permits - indeed, encourages - a district judge to consider the qualifications of a witness." *United States v. Vitek Supply Corp.*, 144 F.3d 476, 486 (7th Cir. 1998).

Qualifications

Defendants claim DiLisio is not qualified because he offers an outcome-determinative legal conclusion that Defendants engaged in

bad faith, and because he lacks specialized knowledge on Indiana law regarding bad faith. Defendants note that DiLisio is not licensed to practice in Indiana, has never tried a bad faith claim, and has little to no knowledge of Indiana's laws regarding bad faith claims. In response, McClain seems to concede that DiLisio cannot offer opinions regarding whether Defendants engaged in bad faith, but asserts that he is qualified to present testimony to the jury regarding industry standards.[7] Defendants do not seriously contend that DiLisio lacks the qualifications to testify regarding industry standards, instead arguing that industry standards are irrelevant because in Indiana bad faith requires a showing of willful or knowing wrongdoing. Accordingly, the Court finds DiLisio qualified to testify regarding industry standards.

<u>Reliability</u>

One of DiLisio's conclusions is that McClain has been "working disabled" from 2007 until 2010 and that she is therefore eligible for benefits under the policy. In reaching this conclusion, DiLisio wrongly presumed that the Policy's effective date was prior to McClain's 2006 CVA. DiLisio's opinions regarding whether

---

[7] McClain notes in her response to the motion in limine that:
Mr. DiLisio has not held himself out as an expert on Indiana law regarding Indiana's covenant of good faith and fair dealing. Mr. DiLisio has offered testimony regarding industry practices for conducting a fair and thorough investigation of a disability claim and his opinions as to how Defendants deviated from those industry standards in processing Ms. McClain's claim.
(DE 52 at 11).

Defendants complied with industry standards are based, at least on part, on this erroneous assumption. Even DiLisio admits that, if his assumption was wrong, McCLain at least "arguably" might not be covered. But, before conceding this, the following exchange took place:

> Q: If it were the case that this policy had come into effect well after the cardiovascular accident, would that change your opinion?
> A: No. It would change my analysis a little bit, but in my opinion it wouldn't change the ultimate result. In other words, I would probably analyze it along these lines.
> You still notice provisions in the policy. You still have requirements that claims be filed in certain timely fashion when a person knows they have a compensable claim. I think you could reach, the analysis would be that even though this policy went into effect after the date or after '06, she is not looking for benefits back to '06. She continued to work.
> She is looking for benefits after the point where she could no longer work and after the point that this policy had become effective. So my analysis is it would be compensable.

(DiLisio Dep. at 87-88). Based on his experience, DiLisio has opined that, even if he were wrong about the effective date, the Defendants nonetheless failed to properly evaluate McClain's claim. The error regarding the eligibility date does not render his testimony regarding industry standards inadmissible. It may, however, render DiLisio's testimony particularly susceptible to cross examination.

<u>Helpful</u>

To the extent DiLisio intends to discuss industry standards and what constitutes reasonable claims treatment, Defendants argue that this is not helpful to the jury in determining whether Defendants engaged in conscious wrongdoing or otherwise disbelieved their own reasons for denying McClain's claim. This same argument was made and rejected in *Sieveking v. Reliastar Life Ins. Co.,* No. 4:08-cv-45, 2009 WL 1795090, at *2 (S.D. Ind. June 23, 2009). In *Sieveking,* Madison sought to exclude this very same expert's testimony for the same reason:

> Finally, defendants move to exclude Sieveking's expert Robert V. DiLisio. DiLisio, an attorney who has worked in various positions within the disability insurance industry, has offered testimony regarding industry practices for conducting a fair and thorough investigation of a disability claim, and will offer his opinion as to how defendants deviated from those practices in processing Sieveking's claim. Defendants argue that, because DiLisio cannot offer testimony regarding their state of mind when processing Sieveking's claim, his testimony would be irrelevant and would not assist the jury. The court disagrees. A lay jury unfamiliar with the insurance industry could be aided by an expert's explanation of how a disability claim should be processed, and DiLisio's proposed testimony will be relevant to the jury's ultimate determination of whether defendants' actions and inactions amounted to bad faith in this case.

*Id*. at *2. The *Sieveking* case is not binding on this Court, but its logic is sound. *See also Lumbermens v. Combs*, 873 N.E.2d 692, 702 (Ind. App. 2007)(affirming trial court's decision to allow an

insurance expert to testify regarding claims practices)(disapproved on other grounds, *Kosarko v. Padula*, 979 N.E.2d 144 (Ind. 2012)).

While DiLisio will be precluded from offering his opinion on whether or not Defendants engaged in bad faith (the ultimate conclusion), his testimony regarding industry standards provides some evidence of bad faith and is admissible. As is noted in the next section, however, a violation of industry standards alone is insufficient to avoid summary judgment on a bad faith claim.


<u>McClain's bad faith claims fail as to both Madison and DRMA</u>.

Insurers have a duty to deal in good faith with its insured. *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 518-19 (Ind. 1993). A plaintiff can demonstrate bad faith by showing that "the insurer had knowledge that there was no legitimate basis for denying liability." *Friedline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002). "As a general proposition, '[a] finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill-will." *Monroe Guar. Ins., Co. v. Magwerks Corp.,* 829 N.E.2d 968, 977 (Ind. 2005)(quoting *Colley v. Indiana Farmers Mut. Ins. Group,* 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998)). Mere negligence is insufficient to support a claim of bad faith. *Erie,* 622 N.E.2d at 520. But, "an insurer which denies liability knowing that there is no rational, principled basis for doing so has breached its duty."

*Id.* The Supreme Court in *Erie* did not determine the extent of the duty of good faith, but noted that:

> [t]he obligation of good faith and fair dealing with respect to the discharge of the insurer's contractual obligation includes the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim.

*Id.* at 519.

Madison and DRMS both claim there is no evidence that they possessed the culpable state of mind necessary to support the bad faith claim. DRMS also argues that they had no duty of good faith to McClain in the first instance because they were just an appeals administrator.

DRMS owed McClain a duty of good faith.

DRMS argues that, under Indiana law, there can only be a duty of good faith by contract or through the formation of a fiduciary relationship. *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 919 (Ind. Ct. App. 2011)("In Indiana law, implied covenants of good faith and fair dealing apply only to insurance and employment contracts or where contracts are ambiguous as to the application of the covenants or expressly impose them."); *Doe v. Roman Catholic Archdiocese of Indianapolis*, 958 N.E.2d 472, 477 (Ind. Ct. App. 2011)("[A] fiduciary relationship exists when a confidence is reposed by one party in another with resulting superiority and

influence exercised by the other.")(citations omitted). It is undisputed that there is not a contractual relationship between McClain and DRMS, but the parties cannot agree on whether a fiduciary relationship exists.

A fiduciary relationship arises only when "one party places a special trust and confidence in a dominant party and it is presumed that a transaction entered into during such relationship is not at arm's length." *Doe*, 958 N.E.2d at 477. "A business or 'arm's length' ... relationship does not give rise to a fiduciary relationship." *Wilson v. Lincoln Fed. Sav. Bank*, 790 N.E.2d 1042, 1046-47 (Ind. Ct. App. 2003). "Not only must there be confidence by one party in the other ...it must be shown "that the dominant party wrongfully abused this confidence ... so as to obtain an unconscionable advantage." *Paulson v. Centier Bank*, 704 N.E.2d 482, 490 (Ind. Ct. App. 1998).

With regard to third-party administrators of insurance, a non-contractual fiduciary duty has been found to arise in the limited context of a third-party administrator who "actually made the decisions" to deny a claim. *Sieveking v. Reliastar Life Ins. Co.,* No. 4:08-cv-45, 2009 WL 1795090, at *2 (S.D. Ind. June 23, 2009). DRMS attempts to distinguish *Sieveking* by noting that they just handled the appeal: they did not actually make the decision to deny the claim in the first instance. While the third party administer in *Sieveking* did make the decision to deny the claim in the first

instance, DRMS has made no effort to explain why that is a distinction that matters - they still denied McClain's claim. DRMS has not convinced this Court that they are free of fiduciary obligations to McClain while handling her insurance appeal. *See Heavlin v. Madison Nat'l Life Ins. Co.*, No. 2:10-CV-505, 2012 WL 6507680, at *9 (N.D. Ind. December 12, 2012)("It does not matter whether the third-party administrator handled the initial claim denial plus the appeals or the appeals only; the third-party administrator owes an insured the same duty of good faith and fair dealing throughout the entire insurance claim process."). As such, this Court finds DRMS did owe McClain a fiduciary duty.

## McClain has produced insufficient evidence of bad faith as to both Madison and DRMS.

Here, Madison's refusal to pay was not unfounded - McClain did not become disabled while insured. Under the clear language of the contract in effect at that time, McClain was not entitled to coverage because she alleged her disabling condition began in 2006. Nonetheless, that was not the reason given by Madison for denying McClain's claim. They denied her claim because they felt she had produced insufficient evidence of disability.

In Indiana, the fact that a good faith dispute about coverage existed will not alone preclude McClain's bad faith claim. *See Monroe Guar. v. Magwerks Corp.*, 829 N.E.2d 968, 977-78 (Ind. 2005)("an insurer's duty to deal in good faith with its insured

encompasses more than a bad faith coverage claim" and "a good faith dispute concerning insurance coverage does not automatically preclude a punitive damages claim for bad faith when coverage is denied."). Despite the fact that refusal to pay was not unfounded, McClain may still pursue a bad faith claim against Madison if she shows that Madison: (1) made an unfounded refusal to pay policy proceeds; (2) caused an unfounded delay in making payments; (3) deceived McClain; or (4) exercised an unfair advantage to pressure McClain into settlement. *Id.* (citing *Erie*, 622 N.E.2d at 520). The court in *Magwerks* declined an invitation to expand Indiana's law of bad faith to include the manner of handling the claim. *Id.* at 976.

Similarly, McClain claims that proof that an insurer violated Indiana's Unfair Claims Practices Act constitutes evidence of bad faith. (DE 63 at 32, citing *Ansert v. Adams*, 678 N.E.2d 839 (Ind. Ct. App. 1997). But what *Ansert* says is that a violation of the statute "would necessarily offer some evidence of bad faith [but] such a showing would not, standing alone, provide the evidence necessary for imposition of punitive damages...". McClain asserts that Madison violated the Unfair Claims Practices Act by: (1) misrepresenting pertinent facts or insurance policy provisions; (2) refusing to pay claims without conducting reasonable investigation; and (3) not attempting in good faith to effectuate fair settlements of claims in which liability has become reasonably clear. *See* I.C.

§ 27-4-1-4.5.

Although not the reason Madison gave for its denial, this Court's finding that McClain was not covered by the Policy prevents McClain from demonstrating that Defendants' refusal to pay was unfounded. For the same reasons, there was not an unfounded delay in making payments. And, there is no evidence whatsoever that Madison exerted any pressure on McClain to settle her claim or tried to deceive her. In fact, McClain admits she is unaware of evidence that Madison subjectively believes she is disabled but refuses to pay anyway, that Madison did not try to make a factually based decision on her claim, that Madison never deceived her or made an untrue statement, or that Madison failed to consider evidence that it should have considered. (McClain Dep. at 74, 77). Similarly, McClain admits that she has no evidence that DRMS was not trying to make a factually based decision regarding her appeal. (McClain Dep. at 76).

McClain argues that Defendants' failure to investigate facts known to support her claim shows bad faith, much like in *Gooch v. State Farm Mut. Auto Ins. Co.*, 712 N.E.2d 38 (Ind. Ct. App. 1999). In *Gooch*, the allegation was that State Farm *intentionally* failed to investigate a line of evidence that it suspected would support Gooch's claim. *Id.* at 41. McClain argues that Defendants failure to get raw data from Dr. Trexler, failure to investigate her unsuccessful return to work, and decision to raise "specious"

coverage arguments three years after the claim was filed all point to bad faith. These arguments are unavailing.

The failure to get raw data from Dr. Trexler, at most, shows negligence. Dr. Brooks noted that the absence of raw data limited the conclusions that could be reached from Dr. Trexler's report. While the Defendants did rely in part on Dr. Brooks' opinion, the Defendants did not hire Dr. Brooks directly and had no direct contact with him. Furthermore, Dr. Brooks testified that he felt he had enough information to write his report without the raw data. Under these circumstances, the failure to obtain Dr. Trexler's raw data can hardly be viewed as evidence of an intentional failure to investigate for fear of finding evidence of disability.

McClain also argues that Defendants' failure to investigate her claim as an unsuccessful return to work shows bad faith. Ironically, if the Defendants had done what McClain claims they should have done, the evidence shows that Defendants would have denied her claim for lack of coverage. Caflisch indicated that if she had understood that McClain was claiming to have been unable to work since 2006, she would have denied the claim pursuant to Section III.B.3 of the Policy. Given the contract language which precludes coverage for McClain in the event she claims she was unable to work prior to the effective date of the Policy, the failure to treat her claim as an unsuccessful work attempt shows that, if anything, they were giving McClain the benefit of the

doubt in *not* treating her as if she had been disabled since her return to work.

Lastly, the Court has already noted that McClain's claims that Defendant first asserted a lack of coverage at the summary judgment stage is erroneous. (*See supra* at 33-34). Accordingly, this provides no evidence of bad faith.

While DiLisio has opined that Madison and DMRS engaged in bad faith, this Court has found that those opinions are not admissible as they go to an ultimate conclusion of law. DiLisio's testimony about violations of industry standards, in this particular case, and in the absence of *any other evidence* of bad faith, is simply not enough to allow a reasonable jury to find bad faith. *Nationwide Mut. Ins. Co. v. Neville*, 434 N.E.2d 585 (Ind. Ct. App. 1982)("[E]ven assuming the investigation of the claim was below industry standards, negligence cannot be the basis for awarding punitive damages."). Even considering the admissible portions of DiLisio's testimony, McClain lacks evidence that either Madison or DRMS had a "state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill-will." *See Monroe Guar. Ins., Co. v. Magwerks Corp.*, 829 N.E.2d at 977.

CONCLUSION

For the reasons set forth above both Madison's and DRMS's motions for summary judgment are **GRANTED IN PART AND DENIED IN PART.** Counts II and III of the Amended Complaint are dismissed. The motion to exclude DiLisio's report and testimony is **GRANTED IN PART AND DENIED IN PART.** DiLisio's testimony regarding industry standards is admissible but his opinions on the issue of whether Defendants acted in bad faith are precluded.

DATED: September 4, 2014          /S/RUDY LOZANO, Judge
                                  United States District Court